UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILLIAM MUTH,                                    )
                                                 )
                              Petitioner,         )    16 C 5601
                                                 )
              vs.                                )    Judge Gary Feinerman
                                                 )
DAVID GOMEZ, Warden, Stateville Correctional     )
Center,                                          )
                                                 )
                              Respondent.         )

## Memorandum Opinion and Order

William Muth, an Illinois prisoner convicted of sex crimes against his daughter, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Doc. 1. He brings two claims: (1) the introduction at trial of statements his daughter made during a videotaped interview violated the Sixth Amendment's Confrontation Clause; and (2) the evidence was insufficient for the jury to find him guilty beyond a reasonable doubt, in violation of the Fourteenth Amendment's Due Process Clause. Muth's claims are without merit, his habeas petition is denied, and a certificate of appealability will not issue.

## Background

A federal habeas court presumes that state court factual findings are correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Jean-Paul v. Douma*, 809 F.3d 354, 360 (7th Cir. 2015) ("A state court's factual finding is unreasonable only if it ignores the clear and convincing weight of the evidence.") (internal quotation marks omitted). The Appellate Court of Illinois is the last state court to have adjudicated Muth's case on the merits. *People v. Muth*, 2014 IL App (2d) 120914-U (Ill. App. Sept. 30, 2014) (reproduced at

Doc. 1 at 50-64).  The following sets forth the facts as that court described them, as well as the procedural background of the state court proceedings.

### A.    The Charges Against Muth

Muth was charged by grand jury with committing various sex offenses against his then-five-year-old daughter, M.M., from January 1, 2007 through February 7, 2008.  Counts 1, 2, and 3 charged predatory criminal sexual assault of a child, 720 ILCS 5/12–14.1(a)(1), alleging that Muth, "'a person [17] years of age or over, committed an act of sexual penetration with M.M., a child under the age of [13] years, in that [he] put his penis in the sex organ of M.M.'"  2014 IL App (2d) 120914-U at ¶ 4 (third alteration added).  Counts 4, 5, and 6 likewise charged predatory criminal sexual assault of a child, alleging that Muth, "'a person [17] years of age or over, committed an act of sexual penetration with M.M., a child under the age of [13] years, in that [he] put his penis in the anus of M.M.'"  *Ibid.* (third alteration added).  Counts 11 and 12 charged aggravated criminal sexual abuse, 720 ILCS 5/12-16(b), alleging that Muth, "'a family member of M.M., knowingly committed an act of sexual conduct with M.M., a female minor under 18 years of age when the act was committed, in that [Muth] touched the buttocks of M.M. with his hand for the purpose of the sexual arousal or gratification of [himself] or M.M.'"  2014 IL App (2d) 120914-U at ¶ 4.  The remaining counts either were dismissed before trial or resulted in an acquittal.

### B.    Ruling on Admissibility of M.M.'s Videotaped Interview

Before trial, the State declared its intention to offer out-of-court statements made by M.M. during a videotaped interview conducted by David Berg, an investigator with the Kane County State's Attorney's Office.  The trial court conducted a hearing under 725 ILCS 5/115-10—which governs the admissibility of out-of-court statements by alleged victims of sex crimes against children—to determine whether M.M.'s statements should be admitted.

2

The State's first witness at the hearing was Elizabeth Muth, M.M.'s mother and Muth's wife, who testified as follows. In early 2007, M.M. told Elizabeth during a car ride that Muth had "'cleaned me with his pee-pee.'" 2014 IL App (2d) 120914-U at ¶ 5. Elizabeth asked M.M. what she had just said, and M.M. repeated it. They were nearly at their destination, so Elizabeth told M.M. that they would talk about it later. That evening, Elizabeth and Muth spoke with M.M. about what she had told Elizabeth, and M.M. said that "'she did not know why she said it; she made up a story; and she was sorry that she said something that was hurtful.'" *Ibid*. Around that time, Elizabeth and Muth were having trouble with M.M. making up stories and not telling the truth. Elizabeth suggested to M.M. that what M.M. had said earlier that day did not "'really ring true'" and that she wanted to know why M.M. had said it. *Ibid*.

On cross-examination, Elizabeth testified as follows. M.M. was not afraid to discuss the matter in Muth's presence and did not mention anything concerning her vagina, her buttocks, or her mouth. Elizabeth was not allowed to be present during Berg's interview of M.M. or to have an attorney present. On redirect examination, Elizabeth testified that M.M. referred to specific areas of her body as her "'butt'" and her "'pee-pee.'" *Id*. at ¶ 6.

Berg testified as follows. He was employed with the Kane County State's Attorney's Office as an investigator at the Kane County Child Advocacy Center. In 1989, the Elgin police department designated Berg to be the primary investigator of child sexual abuse cases, and in that capacity he attended conferences and received training on investigating child sexual abuse and conducting forensic interviews of children. A "'forensic interview of a child'" means "'talking to a child and giving them the opportunity to explain … things that have happened in their life, if anything, and … to record the things they say … in a nonleading fashion.'" *Id*. at ¶ 7. A "nonleading" question is one that does not suggest its answer. On February 7, 2008, Berg

interviewed M.M. at the Advocacy Center, and the interview was video recorded and copied to a DVD. Berg did not recall Elizabeth asking him to be in the interview room, and if she had, Berg would have refused based on the Center's policy.

The trial court then viewed the DVD, which showed as follows. M.M. knew her name, the names of other family members, her age, and the age of her two younger brothers. M.M. was in first grade and identified where she attended school. M.M. said that she had spent the night at her grandmother's house and that her dad had gone with the police somewhere. M.M. felt safe at her house and knew she could call the police if there was a fire or a robber or if something bad was happening. Berg asked, "'Did [your] mom ever tell you about parts of your body that nobody should touch?'" *Id*. at ¶ 9. M.M. responded that her mom had mentioned one part, "'[m]y bottom,'" and told her that "'nobody should touch it except mommy and daddy.'" *Id*. at ¶ 10. M.M. added that "'sometimes they have to clean … because I don't wipe my bottom very good sometimes.'" *Ibid*. Berg asked who helped her, and M.M. responded, "'My mommy or my daddy. Sometimes in the middle of … the night my daddy wakes me up when he cleans me'" and "'he wakes me up I just fall back to sleep and then he cleans me.'" *Ibid*. Berg asked what part is cleaned, and M.M. responded, "'[m]y bottom,'" the "'part where I go pee pee because I don't wipe that.'" *Ibid*. M.M. explained that her dad usually cleaned her because he "'stays up really late and watches the game.'" *Ibid*. M.M. said that her dad "'doesn't come to my room all the time'" and that she wears underwear, a t-shirt, and pajamas when she goes to bed. *Ibid*.

Berg then asked M.M. what touched her when defendant cleaned her bottom. M.M. responded that she did not know. After M.M. indicated again that she did not know, Berg stated, "'You must have some idea,'" and M.M. continued to respond, "'I don't know.'" *Id*. at ¶ 11. Berg asked, "'Is it something that's already in your room? Is it something that your daddy brings

with him when he comes in your room?  Is it some part of your daddy's body?'" *Ibid*.  M.M.

responded twice with her head shaking no, and once with "'I don't know.'" *Ibid*.  Berg stated,

"'Oh yes you do.  Tell me what, … what is that thing that he touches you with?'" *Ibid*.  M.M.

responded, "'I don't know.'" *Ibid*.  Berg asked, "'Well, … is it a part of his body?'" *Ibid*.  M.M.

responded, "'I don't know that?'" *Ibid*.  Berg replied, "'I think you do.  Don't ya?  You

remember.  You can help me cause that's, you know, you came to help me and I just want to

make sure to understand all the things that happened and so … you said … he comes in and

cleans you with that thing, right?  Ok.'" *Ibid*.

　　　　After M.M. continued to express that she did not know, Berg showed her a drawing of a

girl's body.  Berg asked her to identify specific body parts.  M.M. identified the parts where one

goes "'pee pee'" and one goes "'poo poo.'"  *Id*. at ¶ 12.  M.M. indicated that her dad cleaned her

"'pee pee'" part.  *Ibid*.  Berg again asked M.M. what Muth cleans her with or what touches her

bottom when he cleans her, and she responded that she did not know.  Berg asked, "'Can you at

least tell me, remember I asked before, is it something he brings with him?'"  *Id*. at ¶ 13.  M.M.

shook her head, indicating that it was not.  Berg then asked, "'Is it some part of his body?'"  *Ibid*.

M.M. responded, "'I think so.'"  *Ibid*.  Berg asked if she knew what part of his body it was, and

M.M. described it as "'this thing that my brother has and it sticks out and you go potty out of it

and it has a little hole but I don't have it,'" adding that she knew that Muth had one because

"'sometimes I wake up … [a]nd I just feel him and after a while I fall back to sleep.'"  *Ibid*.

　　　　Berg asked what Muth's body part looked like, and M.M. responded that "it has 'a hole

where … he goes potty and he like cleans my bottom out with it.'"  *Id*. at ¶ 14.  Berg asked what

it felt like, and M.M. said, "'[i]t tickles and sometimes he pushes in, it hurts a little.'"  *Ibid*.  Berg

continued, "'when he cleaned your bottom, it was in your bed[,] right?'"  *Ibid*.  M.M. responded,

"'Uh huh. He cleans it in my bed all the time'" and "'when he comes in, I … am still asleep and then when I feel … he (sic) touching me then I start to wake up and fall back asleep and I still try to go back to sleep.'" *Ibid*.

Berg asked M.M. to use the drawing to show where Muth had touched her with his body part, and M.M. "'circled the bottom where the pee pee comes out'" and also said that "'[i]t touches me where I go poo poo.'" *Id*. at ¶ 15. M.M. explained that "'[i]t touches in the middle … [w]here I go poo'" and that "'[i]t hurts sometimes,'" and stated that "'[i]t's always in the night.'" *Ibid*. M.M. did not know the name of the body part that touched her. Berg asked how many times it happened, and M.M. said that "'it doesn't happen all the time'" but that it happened on different nights. *Id*. at ¶ 16. M.M. remembered Christmas and said that it also happened in January.

Berg asked M.M. whether "'any other part of your daddy touch you?'" and she responded, "'[h]is hands,'" explaining that "'sometimes he like touches this or the cheeks to get inside'" and "'he … parts my bottom 'cause he has to get where I go.'" *Id*. at ¶ 17. M.M. said that "'[i]t doesn't feel like anything. It … just feels like … my bottom[']s stretching.'" *Ibid*. M.M. added that her mother "'sometimes touches where I go pee because she has to put lotion on my bottom cause sometimes my bottom itches.'" *Ibid*. Berg asked whether Muth put lotion on her, and M.M. responded, "'when … he cleans me sometimes.'" *Ibid*. Berg asked what he did with the lotion, and M.M. responded that "'[h]e puts it on my bottom and he uses this part and he rubbed it all around,'" both where she goes "'pee pee'" and where she goes "'poo,'" "'cause sometimes it itches.'" *Ibid*.

Berg then asked M.M. whether any other part of Muth's body touched her, and she responded, "'No.'" *Id.* at ¶ 18. Berg asked if Muth ever gave her kisses, and she said yes, "'[o]n her cheek or on her lips.'" *Ibid.* M.M. said that her mother and grandmother also kiss her.

Berg asked M.M. whether she thought about telling anyone, and she responded that she did not want "'to tell my teachers about my bottom.'" *Id.* at ¶ 19. Berg asked what Muth would do or say after he cleaned her bottom, and M.M. responded, "'He doesn't say anything[;] he just pulls my panties and my pants or my skirt back down or up and then he goes away and goes to bathroom and then goes to bed … [o]r back downstairs.'" *Ibid.*

Berg asked M.M. whether she had "'seen anything come out of [her] daddy's thing'" and she responded no. *Id.* at ¶ 20. M.M. then asked if she could ask Berg a question: "'Why do our, why does like our skin have little hairs all over it?'" *Ibid.* Berg explained that little girls did not "'get hair, but men sometimes get hair on their arms.'" *Ibid.* M.M. said it looked "'more like string'" to her. *Ibid.*

After the DVD concluded, Berg identified three exhibits: a rear drawing of a preschool female with the buttocks circled; a frontal drawing of a preschool female with the vaginal area circled; and a frontal drawing of an adult male with circles around the penis and the hands.

On cross-examination, Berg admitted that he did not recall whether he addressed with M.M. the topic of lotion being applied to her. Berg admitted that he did not follow up when M.M. said that her parents disciplined her. Berg admitted that he did not ask anyone whether M.M. had been prescribed medication for any physical condition. And Berg agreed that M.M. admitted in the interview that "'she lies or tells stories.'" *Id.* at ¶ 22.

The trial court ruled that M.M.'s videotaped statements would be admitted at trial "'as long as she testifies.'" *Id.* at ¶ 23.

### C. Ruling on the Admissibility of Muth's Child Pornography Possession Convictions

The trial court ruled earlier in the case that if Muth testified at trial, the State could impeach him with his convictions for twenty-two counts of possessing child pornography. *See People v. Muth*, 2013 IL App (2d) 111310-U (Ill. App. June 6, 2013) (affirming those convictions). Muth moved for reconsideration of that ruling. In support, he observed that records from court-ordered counseling sessions indicated that M.M. believed that one of her biggest problems was telling lies—specifically, on forms that M.M. completed during the sessions, she wrote "lying" in response to "'I need help with,'" "'A habit that I would like to change is,'" and "'I am not proud of.'" 2014 IL App (2d) 120914-U at ¶ 24. Given this, Muth argued that it was important that he testify without the taint that would arise if he were impeached with his child pornography possession convictions. The court "'conditionally granted'" Muth's motion and prohibited the State from using his prior conviction so long as his testimony concerned only the charged incidents and not his character. *Ibid*.

### D. Ruling on Admissibility of Social Worker Expert Testimony

Muth moved to bar the State from calling Laurie Riehm, a social worker, as an expert to testify about the general behavior patterns of children who have been sexually assaulted. The trial court ruled that Riehm could testify provided that the defense had an opportunity to speak with her, that the court could first hear the proffered testimony outside the presence of the jury, and that the requirements of *People v. Atherton,* 940 N.E.2d 775 (Ill. App. 2010), were satisfied. As noted below, the court at trial ruled that Riehm could testify as an expert "'in the area of dynamics of child sexual abuse, including disclosures.'" 2014 IL App (2d) 120914-U at ¶ 25.

### E.     Trial

The case was tried to a jury in June 2012.  M.M. testified on direct examination as follows.  She was eleven years old at the time of trial and had two younger brothers.  When she was in kindergarten and first grade, her bedtime routine included baths on Saturday night.  Her bedtime attire was a nightgown or a shirt with bottoms.  Her mother helped give her baths, and she bathed with her brothers.  Either her mother or her father would say prayers to her when she went to bed.  M.M. had not seen her father for four years.  She had difficulties wiping herself when she used the bathroom.  She used to wet the bed, and her mother or father would clean up and change her pajamas.  She did not recall talking to Berg or seeing the exhibits depicting anatomical drawings of a girl, and she was uncomfortable saying the names of her private body parts.  She could not remember whether her father ever cleaned "'the parts'" where she went to the bathroom.  *Id*. at ¶ 27.  She did not think that a boy's or man's body parts or private parts had ever touched her.  Her mother would apply lotion to her bottom.

After M.M.'s direct examination, Muth objected to her testimony and to the admission of her videotaped statement.  The court overruled the objection, explaining that although M.M. did not recall any abuse, she answered the questions asked on direct examination and was available for cross-examination.

On cross-examination, M.M. testified as follows.  She recently finished the fifth grade, made honor roll, and was a straight "A" student.  She recalled that she had trouble in first grade wiping herself properly and wetting her bed.  The front and back of her bottom would get irritated, she would develop rashes and infections on her private parts, and it would hurt to wipe.  Her mother and father would put lotion on both the front and back parts of her bottom, and they taught her how to wipe properly.  A female counselor she had seen weekly for four years taught her about the different parts of the human body.  M.M. "did not recall ever seeing [Muth's]

penis." 2014 IL App (2d) 120914-U at ¶ 30. She admitted that she had a problem with lying and that she had lied to her parents. In fact, M.M. acknowledged that "one of her biggest problems was telling lies, including when she was in kindergarten and first grade." *Ibid*.

Elizabeth testified as follows. After M.M. was potty trained, she had difficulty wiping herself correctly after using the toilet, and she would also urinate in her underwear, which would cause irritation, redness, infections, and pain. M.M.'s pediatrician instructed Elizabeth and Muth to apply lotions, like Desitin, to relieve M.M.'s irritation. Although M.M.'s hygiene issues improved over time, over the past few years she occasionally had irritation and itching, which required Elizabeth to clean her and apply lotions.

Elizabeth further testified as follows. Early one morning between January and May 2007, M.M.—who was then five years old—made "'an offhand[ed] comment'" during a ride to a carpool drop-off point. 2014 IL App (2d) 120914-U at ¶ 32**.** The comment was that "'daddy cleaned me with his pee-pee.'" *Ibid*. At that time, M.M. had been repeatedly lying. Later that day, Elizabeth suggested to Muth that he talk to M.M. about what she had said. That evening, Muth spoke with M.M. in her bedroom; Elizabeth briefly stood outside and listened, and then went downstairs. The conversation between Muth and M.M. lasted about three to four minutes. A few minutes after Muth came downstairs, M.M. came downstairs and told them that what she had said "'about daddy'" was a lie and that she was sorry. *Ibid*.

Jamil Brown, an officer with the South Elgin Police Department, testified as follows. During an interview on February 6, 2008, Elizabeth said that when she awakened M.M. for school one morning, M.M. commented that she needed to be cleaned during the night and that Muth had cleaned her with his "'thing'" and then "'washed his hand.'" *Id*. at ¶ 33. Elizabeth

told Brown that she asked M.M. about the statement and determined that it was not serious. Elizabeth did not suggest to Brown that M.M. later admitted that her statement was a lie.

The State then tendered Riehm outside the jury's presence as an expert on the dynamics of sexual abuse, including how children disclose sexual abuse, piecemeal disclosures, delayed disclosures, retraction, recantation or lack of memory, the impact of disclosures on a child, and the physical act perpetrated on the child. Muth's counsel cross-examined Riehm, the parties presented argument, and the trial court held that she could testify as an expert on those topics.

Riehm testified as follows. She had worked for 26 years with traumatized children, particularly children who had been sexually abused. Riehm worked with a doctor to develop a video demonstrating how an abused child recalls details of an "'event.'" 2014 IL App (2d) 120914-U at ¶ 35. She had been qualified as an expert witness in the area of "dynamics of child sex abuse," which concerns disclosure, recantation, minimization, and acting out. Riehm had never met M.M., did not review any materials or police reports concerning M.M., and would testify only about general principles in her field.

Riehm further testified as follows. Ninety-three percent of child sexual abuse is committed by somebody the child knows and trusts. The closer the relationship with the perpetrator, the more difficult it is for the victim to talk about the abuse. "[S]ome children understand the mother's financial dependency on the alleged offender." *Id*. at ¶ 36. In cases where the child develops mental health problems, more than 30% of the time the problems are "'caused by the mother not believing the child's claim of sexual abuse.'" *Ibid*. Even if the abuse is disbelieved by a parent, the child may still do well in school and make friends. Sexual abuse can manifest with bed-wetting and toilet problems. Some abused children who suffer severe stress can have developmental regression, meaning regression from developmental milestones

that they had previously accomplished; for example, the child might have problems with hygiene or toileting as a manifestation of such stress.

Riehm further testified as follows.  Recantation occurs when an abused child attempts to take back what she originally said.  Some children recant after realizing that family members have been removed from their life or if they see that the family is suffering financial pressure.  Some children develop coping skills that make it difficult for them to recall and describe the events.  A person conducting a forensic interview with a child should ask nonleading questions and should not challenge the child when he or she indicates that "'she does not recall being abused.'"  *Id*. at ¶ 37.

Berg testified regarding his February 2008 interview with M.M.  Over Muth's objection, the interview transcript was published to the jury and the DVD was played.  On cross-examination, Berg acknowledged that although M.M. said that Muth had cleaned her with a "'thing,'" it was Berg who first used the term "'the thing'" during the interview.  *Id*. at ¶ 38.

Muth moved for a directed verdict at the close of the State's case.  The State argued that it had shown three separate incidents of predatory criminal sexual assault of a child (Counts 1-6), with each incident involving sexual penetration of both the sex organ and anus: (1) the incident preceding M.M.'s "'outcry to the mother'" in early 2007; (2) M.M.'s statement to Berg that the last time "'it'" happened was January 21, 2008; and (3) M.M.'s statement that "'there were other times it would happen.'"  *Id*. at ¶ 39.  As to aggravated criminal sexual abuse (Counts 11-12), the State cited M.M.'s statement that "'sometimes he would use his hands, and he would, you know, touch her buttocks, and he would part her buttocks, and once again, because she didn't say, hey, this only happened one time, and she was saying sometimes this happened, so it happened more than once.'"  *Id*. at ¶ 40.  The trial court denied Muth's motion.

Dr. Michael Slavik, M.M.'s pediatrician since birth, testified as follows during Muth's case-in-chief. Dr. Slavik had training in the diagnoses of sexual abuse in children. When M.M. was old enough to urinate in a cup, she tested positive for a common urinary infection, which can indicate kidney problems. When M.M. was four years old, "'there was a little bit of masturbation,'" which could have contributed to infections and hygiene problems. 2014 IL App (2d) 120914-U at ¶ 42. M.M. had constant problems with constipation, which often accompanied urinary tract infections and problems with bed-wetting. When M.M. was five or six years old, she had rashes in the vaginal area and on the anus, for which he recommended ointment. A parent should apply ointment on a five- or six-year-old child.

Dr. Slavik further testified as follows. On February 21, 2008, he interviewed and physically examined M.M. after Elizabeth told him there had been an allegation of sexual abuse. He found no evidence of physical, sexual, or emotional abuse. In September 2009, Elizabeth brought M.M. in for a check-up and told Dr. Slavik that M.M. had had three urinary tract infections, "'or stool incontinence,'" over the past year. *Id*. at ¶ 43. Dr. Slavik examined M.M. and found a rash over her gluteal muscles. M.M.'s private parts were normal, as he had observed in February 2008.

Muth testified as follows. He never sexually assaulted M.M. M.M. had difficulties with her hygiene from ages two through five. Every night he checked his other children's diapers and M.M.'s underwear to make sure they were not sleeping in soiled clothes. He had to clean M.M. two to three times per week and had to change her sheets about twice per month. The night before M.M. made the statement to Elizabeth, he had gone to M.M.'s bedroom and found that she had soiled her underwear, and he changed her underwear, cleaned her, and washed her underwear and placed it on the washing machine to dry. On one occasion when M.M. was five

years old, her three-year-old brother stood up in the bathtub and urinated on her, and she yelled that her brother was "'cleaning her with his pee-pee.'" *Id*. at ¶ 44.

In rebuttal, the State called Dr. Sangita Rangala, who testified as follows. Dr. Rangala provided medical services to children who may have been sexually abused and was an expert in the medical evaluation of pediatric sexual abuse. She never met M.M. but had some of her medical records. Sexually abused children have normal physical examinations because the hymen can heal within 24 hours. If the child is examined more than thirty days after the abuse, the physical examination will be normal 98-99% of the time, and finding anal abnormality "'outside of the first 24 hours is almost unheard of.'" *Id*. at ¶ 45. When interviewing a child about sexual abuse, the parent is asked to step out of the room unless the child wants the parent present. If a child is repeatedly asked the same question by an adult, the child will want to respond in a manner that will please the adult.

In its closing argument, the State argued that Muth went into M.M.'s bedroom "'almost every day of the week,'" pulled down her underwear, and placed his penis "'on her sex organ her vagina or her anus.'" *Id*. at ¶ 46. The State further argued that Muth penetrated M.M. several times: "'You had the outcry to the mother almost a year before. You had what she told Investigator Berg, that this occurred in January of 2008. Not only did he rub his part, his thing, on her pee-pee or her bottom, where she, in her words, goes poo-poo. And you heard the defendant this morning. He was in that room almost every night, every night.'" *Ibid*. And the State argued that the two aggravated criminal sexual abuse charges were proved by evidence that Muth "admitted going in there and taking her underwear down" and that the crimes occurred when Muth placed his hands on her buttocks and spread her "'cheeks so that he could get to her anus with his penis.'" *Ibid*.

In Muth's closing argument, counsel argued that in the videotaped interview with Berg, M.M. said thirty-three times that she did not know what happened and eleven times that she could not remember what happened. Counsel further argued that M.M. during the interview said that she did not know what happened nineteen times before being shown the drawing of the man's penis, and that at the 17:49 mark, Berg whispered "'penis'" to M.M. *Id.* at ¶ 47.

The jury found Muth guilty of the six predatory criminal sexual assault of a child charges (Counts 1-6) and the two aggravated criminal sexual abuse charges (Counts 11-12). The court imposed six consecutive six-year sentences for the predatory criminal sexual assault charges, and two concurrent four-year sentences for the aggravated criminal sexual abuse charges to be served consecutively to the predatory criminal sexual assault sentences.

### F.      Appeal

Muth appealed, arguing, as pertinent here, that: (1) the State's evidence was insufficient to establish his guilt beyond a reasonable doubt; and (2) admitting M.M.'s videorecorded statement violated the Confrontation Clause. Doc. 18-2 at 21-40. The state appellate court rejected those arguments on the merits and affirmed. 2014 IL App (2d) 120914-U (Ill. App. Sept. 30, 2014). Muth raised the same claims in a petition for leave to appeal, Doc. 18-6 at 7-17, which the Supreme Court of Illinois denied, *People v. Muth*, 23 N.E.3d 1205 (Ill. 2015) (reproduced at Doc. 18-5). After the United States Supreme Court denied certiorari, *Muth v. Illinois*, 135 S. Ct. 2364 (2015), Muth timely filed this habeas petition.

### Discussion

Muth's habeas petition states two claims: (1) the introduction at trial of M.M.'s videotaped interview violated the Confrontation Clause; and (2) his convictions were not supported by proof beyond a reasonable doubt, thereby violating the Due Process Clause. Doc. 1 at 5-6. Because the state appellate court was the last state court to review those claims on the

merits, this court will review that court's decision under the standard codified in 28 U.S.C. § 2254(d). *See Stern v. Meisner*, 812 F.3d 606, 609 (7th Cir. 2016). "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of th[e] [Supreme] Court, § 2254(d)(1); or that it 'involved an unreasonable application of' such law, § 2254(d)(1); or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (internal citation omitted); *see also Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (same); *Gilbert v. McCulloch*, 776 F.3d 487, 492 (7th Cir. 2015) (same).

"[A] state court decision involves an 'unreasonable application of' federal law [under § 2254(d)(1)] if the state court 'correctly identifies the governing legal principle … but unreasonably applies it to the facts of the particular case.'" *Kamlager v. Pollard*, 715 F.3d 1010, 1015-16 (7th Cir. 2013) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). To obtain relief on that ground, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Wheeler*, 136 S. Ct. 456, 460 (2015). Although the "lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since a general standard from [the Supreme Court's] cases can supply such law," *Gilbert*, 776 F.3d at 491 (alteration in original) (internal quotation marks omitted), "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e]

[Supreme] Court's precedents," *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (internal quotation marks omitted).

A state court decision is based on an "unreasonable determination of the facts [under § 2254(d)(2)] if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Morgan v. Hardy*, 662 F.3d 790, 801 (7th Cir. 2011). "[A] state court's factual finding is never unreasonable 'merely because the federal habeas court would have reached a different conclusion in the first instance.' Rather, the state court's determination of the facts must have been an unreasonable error in light of the evidence presented to that court." *Collins v. Gaetz*, 612 F.3d 574, 586 (7th Cir. 2010) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

## I.     Confrontation Clause Claim

Muth argues that the admission at trial of M.M.'s videotaped interview violated the Confrontation Clause and that the state court's holding to the contrary unreasonably applied clearly established law and rested on an unreasonable determination of the facts. Doc. 1 at 30-39. He is wrong in both respects.

### A.     The State Court Did Not Unreasonably Apply Clearly Established Law.

The Confrontation Clause "guarantees criminal defendants the benefit of the principal means by which the believability of a witness and the truth of h[er] testimony are tested— subjecting that testimony to the crucible of cross-examination." *Jones v. Basinger*, 635 F.3d 1030, 1040 (7th Cir. 2011) (internal citation and quotation marks omitted). To ensure the "benefits of cross-examination, the Sixth Amendment bars the admission of 'testimonial hearsay' against a criminal defendant unless (1) the declarant is unavailable at trial; and (2) the defendant had a prior opportunity to cross-examine that declarant." *Id.* at 1041 (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). That said, if the "declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of h[er] prior testimonial

statements." *Crawford*, 541 U.S. at 59 n.9.  Thus, the Confrontation Clause "does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Ibid*.

The Warden contends that the admission of M.M.'s videotaped interview did not violate the Confrontation Clause because her statements were not testimonial and, alternatively, because she was available for cross-examination.  Doc. 17 at 13-18.  Even if M.M.'s videotaped statements were testimonial, *cf. Ohio v. Clark*, 135 S. Ct. 2173, 2182 (2015) ("Statements by very young children will rarely, if ever, implicate the Confrontation Clause … .  [I]t is extremely unlikely that a 3-year-old child in [the declarant's] position would intend h[er] statements to be a substitute for trial testimony."), the Warden is right that M.M.'s availability for cross-examination defeats Muth's Confrontation Clause claim.  At a minimum, the state appellate court did not violate clearly established law in rejecting Muth's claim on this ground.  2014 IL App (2d) 120914-U at ¶ 67 (reasoning that "M.M. was not unavailable, but rather testified at trial and was present to defend or explain the testimony on cross-examination").

Muth argues that M.M.'s inability at trial to recall the statements she made during her videotaped interview with Berg, along with her inability to recall any abuse by Muth or the circumstances under which it occurred, rendered her "unavailable" as a witness.  Doc. 1 at 33-36.  That argument finds no support in Supreme Court precedent, and in fact is affirmatively defeated by *United States v. Owens*, 484 U.S. 554 (1988).  *Owens* holds that the Confrontation Clause "guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *Id*. at 559 (internal quotation marks omitted).  Of particular relevance here, *Owens* holds that so long as the "defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness … and even … the very fact that he has a bad memory," he is not denied the

opportunity to cross-examine a witness whose "past belief is introduced" via an out-of-court statement, even where the witness "is unable to recollect the reason for that past belief." *Id*. at 559. Of equal significance, *Owens* observed that the Supreme Court "has never held that a Confrontation Clause violation can be founded upon a witness' loss of memory." *Id*. at 557.

Muth had an adequate opportunity to cross-examine M.M. Muth's counsel sought to undermine the accuracy of her videotaped statements, eliciting testimony that she "did not recall ever seeing [Muth's] penis" and that "one of her biggest problems was telling lies, including when she was in kindergarten and first grade." 2014 IL App (2d) 120914-U at ¶ 30. Because Muth had the opportunity to—and in fact did—cross-examine M.M. on those matters, the fact that she did not recall her videotaped interview or any abuse by Muth did not render her unavailable for cross-examination, and therefore did not render her statements inadmissible under the Confrontation Clause. *See Owens*, 484 U.S. at 556 (holding that there was no Confrontation Clause violation where the victim's out-of-court identification of the defendant was admitted at trial, even though the victim could not "remember seeing his assailant" or "whether [anyone] had suggested [before the out-of-court identification] that [the defendant] was the assailant"); *Cookson v. Schwartz*, 556 F.3d 647, 652 (7th Cir. 2009) (holding that the introduction at trial of the victim's out-of-court statements did not violate the Confrontation Clause, even though at trial she could not recall making them); *Yanez v. Minnesota*, 562 F.3d 958, 962-65 (8th Cir. 2009) (same, even though the victim could not "recall the details of her prior statements or the incidents that led to those statements," given that the defendant had the opportunity on cross-examination to "remind the jury of [her] inability to recall the abuse or any details related to the criminal acts and thus call into question her reliability").

Muth attempts to distinguish *Owens* on the ground that M.M. did not "bear testimony" against him at trial in that she "did not make any accusations against him" or testify "that she believed [he] had sexually abused her." Doc. 30 at 5-6. That argument is defeated by *United States v. Keeter*, 130 F.3d 297 (7th Cir. 1997), which held there was no Confrontation Clause violation where the district court admitted a witness's affidavit averring that the defendant asked him "to send drug-related messages," even though the witness feigned amnesia at trial and "claimed [an] inability to remember anything except his name." *Id*. at 301. In so holding, the Seventh Circuit deemed irrelevant the fact that "the victim in *Owens* had genuine rather than feigned amnesia, and could at least remember making the identification (which [the witness in *Keeter*] purported to be unable to do)." *Id*. at 302. Instead, the Seventh Circuit held that the "Supreme Court's point [in *Owens*] was that the confrontation clause … [is] satisfied when the witness must look the accused in the eye in court; [and] shortcomings in the declarant's memory may be made known to the jury." *Ibid*.

Here, M.M. did more than look Muth in the eye in court. She responded to questions posed by Muth's counsel, who had the opportunity to question the credibility and accuracy of her videotaped statements due to her admitted problem with lying as a five- and six-year old and her inability at trial to recall any abuse. Given this, the admission of M.M.'s videotaped statements did not violate the Confrontation Clause; more to the point, the state courts certainly did not unreasonably apply clearly established Supreme Court precedent in so holding.

**B.      The State Court Did Not Unreasonably Determine the Facts.**

Muth argues that the state appellate court's determination that M.M. "'answer[ed] questions that could serve as the foundation for meaningful cross-examination'" was an unreasonable determination of fact within the meaning of § 2254(d)(2). Doc. 1 at 36 (quoting *Muth*, 2014 IL App (2d) 120914-U at ¶ 71). This is so, he asserts, because the testimony his trial

counsel was able to elicit from M.M. on cross-examination—including her age, proficiency in school, and admission that she "had problems with telling lies"—was "no more probative than testimony about her favorite color." *Id*. at 37.

Muth's argument simply recapitulates his § 2254(d)(1) argument. In his purported § 2254(d)(2) challenge, Muth disputes not the appellate court's summary of M.M.'s cross-examination, but its legal conclusion that the opportunity to cross-examine her was adequate. As explained above, M.M.'s cross-examination satisfied the standard set forth in *Owens* and *Keeter* for determining when a witness is available for cross-examination for Confrontation Clause purposes.

## II.      Sufficiency of the Evidence Claim

Muth's due process claim submits that the evidence at trial was insufficient under *Jackson v. Virginia*, 443 U.S. 307 (1979), to prove beyond a reasonable doubt that he committed any of the charged offenses; in the alternative, he contends that the evidence supports convictions for only two counts of criminal sexual abuse and two counts of predatory criminal sexual assault. Doc. 1 at 39-47. Although Muth frames his claims separately under § 2254(d)(1) and § 2254(d)(2), the two inquiries are functionally the same on federal habeas review given the nature of his *Jackson* challenge.

Muth argued on direct appeal and reiterates here that there was insufficient evidence to support his convictions because "the State's evidence was primarily based" on M.M.'s videotaped interview, which was "rendered untrustworthy by Berg's suggestive and manipulative interviewing techniques." 2014 IL App (2d) 120914-U at ¶ 64. The state appellate court rejected that argument. The backdrop of that rejection was its determination that the trial court had not erred in admitting the videotaped interview:

The questions asked of M.M. by … Berg were not unduly suggestive or coercive … . Berg did ask some leading questions and did encourage M.M. to be more candid. However, this is understandable in light of M.M.'s age and the need to focus the interview, rather than to appear threatening or intimidating. Berg's repetition of questions to M.M. following her responses of "I don't know" seemed to help transition the interview to a point where M.M. was responding more substantively given her possible reluctance or embarrassment at describing the details of the incidents … . M.M. also explained why she did not tell anyone; she did not feel comfortable discussing her "bottom" with her teacher … . Even if defendant's assertion is true that Berg whispered "penis" to M.M. during the interview, M.M. never repeated the word in a response to his questions … . The DVD and the transcript of the DVD do not support defendant's argument that M.M. was led to provide incriminating statements about him.

*Id*. at ¶ 57 (internal citations omitted). Next, drawing "all reasonable inferences from the record … in favor of the State," *id*. at ¶ 78, the appellate court concluded:

M.M.'s testimony at trial, the DVD and transcript of Berg's 2008 interview of M.M., and the remainder of the State's evidence were sufficient to show multiple instances of contact occurred. Elizabeth … testified that, between January and May 2007, M.M. had commented to her that "daddy cleaned me with his pee-pee." In the 2008 interview, M.M. indicated to Berg that "[s]ometimes in the middle of … the night my daddy wakes me up when he cleans me." [She] explained that [Muth] cleaned the "part where I go pee pee because I don't wipe that." M.M. also told Berg that "sometimes I wakes up … and I just feel him" and "sometimes he pushes in." M.M. continued, "[i]t touches in the middle … [w]here I go poo" and that "[i]t hurts sometimes" and, when it happens, "[i]t's always in the night."

*Id*. at ¶ 80.

In so holding, the appellate court correctly identified the *Jackson* standard for evaluating insufficient evidence claims. 2014 IL App (2d) 120914-U at ¶ 63 (citing *People v. Collins*, 478 N.E.2d 267, 276-77 (Ill. 1985), which in turn quoted *Jackson*). Under that standard, an insufficient evidence claim fails if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. On federal habeas review, a *Jackson* claim is "subject to two levels of judicial deference creating a high bar: first, the state appellate

court determines whether any rational trier of fact could have found the evidence sufficient; second, a federal court may only overturn the appellate court's finding of sufficient evidence if it was objectively unreasonable." *Saxon v. Lashbrook*, 873 F.3d 982, 988 (7th Cir. 2017). Muth's arguments do not surmount that high bar.

As noted, to support his claim that the evidence was insufficient to support any of his convictions, Muth argues that the "only evidence that [he] molested his daughter came from the videotaped interview" and that M.M. testified at trial that she did not think she had been abused. Doc. 1 at 41. Muth adds that the interview was leading and coercive, observing that M.M. "stated that she did not know what happened 33 times," *id*. at 41, and that Berg "subtly attempted to manipulate [M.M.] by using the word, 'penis' before asking a question," *id*. at 42. Those are perfectly fine points for closing argument at trial, but they do not establish that the appellate court unreasonably applied *Jackson* in holding that a reasonable jury could have convicted Muth given: (1) M.M.'s statements during the interview, 2014 IL App (2d) 120914-U at ¶¶ 9-20; (2) the testimony of Riehm, a qualified expert in the behavior patterns of sexually assaulted children, that some children will recant after they realize that family members have been removed from their life or if they see that the family is suffering financial pressure, and that some children develop coping skills that prevent recall, *id*. at ¶ 37; and (3) the testimony of Rangala, a qualified expert in the medical evaluation of pediatric sexual abuse, that if a sexually abused child is examined more than thirty days after the abuse, as M.M. was, the physical examination will be normal 98-99% of the time, *id*. at ¶ 45. *See United States v. Grayson Enters.*, __ F.3d __, 2020 WL 701714, at *13 (7th Cir. Feb. 12, 2020) ("We will affirm the conviction unless, after thus viewing the evidence in favor of the government, no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. We have described this burden as

nearly insurmountable. [Defendant] has not surmounted it.") (internal quotation marks and citation omitted); *United States v. Faulkner*, 885 F.3d 488, 491-93 (7th Cir. 2018) (same); *United States v. Taylor*, 637 F.3d 812, 815-16 (7th Cir. 2011) (same).

That leaves Muth's alternative claim that the appellate court unreasonably applied *Jackson* in holding that there was sufficient evidence to convict him of *three* counts each of "predatory criminal sexual assault of a child (penis to vagina)" and "predatory criminal sexual assault (penis to anus)," 2014 IL App (2d) 120914-U at ¶ 76—one of each type on three separate nights—rather than simply *one* count of each, because it is impossible to determine how "many times the[] alleged acts occurred based on M.M's statements to Berg, other than that each occurred on one occasion." Doc. 1 at 44. In rejecting that claim, the appellate court pointed to M.M.'s statements during the videotaped interview that "'[s]ometimes in the middle of … the night my daddy wakes me up when he cleans me,'" that "'sometimes he pushes in'" while cleaning her, that "'[i]t hurts sometimes,'" and that "'it doesn't happen all the time'" but that it did happen on different nights. 2014 IL App (2d) 120914-U at ¶ 80. The court reasoned that because "'sometimes' connotes a meaning of more than once," *id*. at ¶ 80, and because M.M. testified that the abuse happened "on different nights," *ibid*., a reasonable jury could have found Muth "guilty beyond a reasonable doubt of multiple counts of predatory criminal sexual assault," *id*. at ¶ 81.

That holding did not unreasonably apply *Jackson*. Although the jury was not obligated to find that predatory criminal sexual assault had occurred on three separate nights, each involving M.M.'s vagina and anus, the jury was allowed to infer from her videotaped interview that each kind of assault had occurred on at least three nights:

Berg:  … And then you told me that sometimes your daddy cleans your bottom.  Right?  And but you didn't tell me what does he clean your bottom with?  What what touches your bottom when he cleans it?

M.M.:  I don't know.

Berg:  Ok.  Can you at least tell me, remember I asked before, is it something he brings with him?  (head shake no)  Is it some part of his body?

M.M.:  I think so.

Berg:  You think so?  Ok.  Is it a part of do you know what part of his body it is?

M.M.:  Hum, yes.

Berg:  What's it called?

M.M.:  Uh, I don't know.

Berg:  Have you ever heard anybody say a name for the part of his body?

M.M.:  I know it's this thing that my brother has and it sticks out and you go potty out of it and it has a little hole but I don't have it.

Berg:  Ok so your little brother has one and it sticks out.

M.M.:  And my daddy has one now.

*   *   *

Berg:  How you how do you know your daddy has one?

M.M.:  Because sometimes I wake up

Berg:  Yeah.

M.M.:  And I just feel him and after a while I fall back to sleep.

Berg:  Ok, and where do you feel it?

M.M.:  Right here.

Berg:  Ok.  And the thing you that you feel is that the[] thing you were saying that your daddy has like your brother has?

M.M.:  Uh huh.  I think boys just have it 'cause my mommy doesn't have it.

*   *   *

Berg:   What what does your what does your daddy's look like?

M.M.:   Well it looks like this thing, it has a hole where it he goes potty and he like cleans my bottom out with it.

Berg:   Cleans your bottom out with it too?  Ok, what does it feel like when he cleans your bottom out with it?

M.M.:   It tickles and sometimes he pushes in, it hurts a little.

Berg:   Sometimes it hurts a little too?  Hum.  Well, how many times did he do that?

M.M.:   I don't know.

*   *   *

Berg:   Well.  Now you said it touched you.  Show me on this picture any places where that thing on your daddy touched you.

M.M.:   Put one circle that.

Berg:   Alright where you circled the bottom where the pee pee comes out, right?  And you said that sometimes it tickles and sometimes it hurts, right?  Ok.  And did does your daddy's thing like that touch you anywhere else?

M.M.:   Yes.

Berg:   Where?

M.M.:   It touches me where I go poo poo.

*   *   *

Berg:   In in where you go poo?  Ok.  What does that feel like?

M.M.:   Well, it hurts sometimes.

*   *   *

Berg:   Ok, and what time of it is it when he does that?

*   *   *

M.M.:   It's always in the night.

*   *   *

Berg:   Did anybody except your daddy, ever do that?

M.M.:   No.

*  *  *

Berg:   … I wanna show you a different picture and to find the right one here, ok?  What is that a picture of?

M.M.:   A man.

Berg:   How can you tell it's a man?

M.M.:   Because that.

Berg:   Ok.

M.M.:   And that's the part I was talking about that he uses.

Berg:   That's the part he uses.  Do you want to draw circle around that part?

M.M.:   Um hum.

Berg:   And tell me tell me what's that called.

M.M.:   I don't know.

Berg:   You don't know.  Ok.  Now, is is that the part that touches your bottom

M.M.:   Um hum.

Berg:   where you pee and it touches your bottom where you poo?

M.M.:   Um hum.

Berg:   And you said it happens all the time?

M.M.:   Not I said it doesn't happen all the time.

Berg:   Ok but I think you said it happened.  How how many times did it happen?

M.M.:   I don't know.

Berg:   Did I happen on on different days?

M.M.:   Um,

Berg:   Or different nights, you said it was always at night, right?

M.M.:   Um hum. (head shake yes)

Berg:   Did it happen on different nights?  (head shake yes)  Yeah.  How and you were when was the last time that that your daddy did that?

M.M.:   I don't really know.

Doc. 18-7 at 18-23.  Given this evidence, the jury's conviction of Muth for six counts of predatory criminal sexual abuse (three nights with two kinds of abuse each night) fell well within the bounds established by *Jackson*.  More to the point on federal habeas review, the appellate court's rejection of Muth's *Jackson* claim falls well within the bounds established by § 2254(d)(1).  *See London v. Clements*, 600 F. App'x 462, 466 (7th Cir. 2015) (holding that the petitioner's *Jackson* claim could be "quickly dispense[d]" with because the "state appellate court concluded that [the child sexual abuse victim's] testimony alone sufficed to satisfy the *Jackson* standard" and the habeas court "[could not] say that conclusion was unreasonable"); *Cookson*, 556 F.3d at 650-55 (holding that the state court did not unreasonably apply clearly established federal law in a similar case involving allegations of child sexual abuse and a Confrontation Clause claim); *see also Jones v. Butler*, 778 F.3d 575, 582 (7th Cir. 2015) (holding under *Jackson* that "[e]ven if [an eyewitness] had been the sole witness to testify against [the petitioner], [her] testimony alone would be legally sufficient to convict"); *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) (holding that the "testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar").

## Conclusion

Muth's petition for a writ of habeas corpus is denied.  Habeas Rule 11(a) provides that the district court "must issue or deny a certificate of appealability [('COA')] when it enters a

final order adverse to the applicant." *See Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011).

Regarding Muth's claims, the applicable standard is:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that … includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.

*Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal quotation marks omitted); *see also*

*Lavin*, 641 F.3d at 832 (same).

The court's denial of Muth's habeas claims relies on settled precedents and principles. The application of those precedents and principles to his petition does not present difficult or close questions, and so the petition does not meet the applicable standard for granting a certificate of appealability. The court therefore denies a certificate of appealability.

March 3, 2020

_____

United States District Judge